**METRO BUS LINES, Inc., v. RAILROAD COMMISSION et al.**

No. 9496.

Court of Civil Appeals of Texas. Austin.
May 2, 1945.

Rehearing Denied May 23, 1945.

T. S. Christopher, of Fort Worth (Culbertson, Morgan, Christopher & Bailey, of Fort Worth, and Donley Suddath, of Henrietta, of counsel), for appellant.

Grover Seller, Atty. Gen., and Eugene N. Catlett, Geo. W. Barcus, and John C. Knorpp, Asst. Attys. Gen., for appellee Railroad Commission of Texas.

Cantey, Hanger, McMahan, McKnight & Johnson and Fisher T. Denny, all of Fort Worth, for appellee Texas Motor Coaches, Inc.

BAUGH, Justice.

Appeal is from a judgment, in a trial to the court, sustaining an order of the Railroad Commission, which order denied to appellant an amendment to its certificate of convenience and necessity. In its application appellant sought to enlarge its motor carrier service over Jefferson highway between downtown Dallas, through Oak Cliff, to Arlington and intermediate points, and to extend same on to Dalworthington Gardens, a community located some four miles southwest of Arlington. The original certificate of convenience and necessity was issued to Mark Raley in 1941, and authorized transportation of passengers to and from Dallas, Arlington and intermediate points only to and from U. S. Government War Plants situated south of Jefferson highway about half way between Dallas and Arlington. That is, only passengers destined to or departing from these war plants could be carried and no service between intermediate points other than to and from such war plants was permitted. Raley's certificate was thereafter acquired by appellant. Raley originally began operation with three busses. That operation has expanded until at the time the application here involved was made appellant was operating 37 busses over a 24-hour daily service comprising more than 100 schedules, and transporting daily approximately 40,000 passengers. Meantime the area between Dallas and Arlington along this route had rapidly developed subsequent to 1941. Grand Prairie, an incorporated town about half way between Dallas and Arlington, had grown from about 1500 inhabitants to about 25,000; and in addition to numerous individual residences and business enterprises along Jefferson highway, large housing projects have been constructed, one consisting of 800 units. These facts and circumstances and the further fact, both proven and judicially known, that lack of new cars and tire and gasoline rationing have continuously reduced the use of private transportation, have increased the demand and need for additional public transportation, not only to war plants but to and from Dallas and Fort Worth and intermediate points. Because of these changed conditions and to supply such need appellant applied to the Commission to remove restrictions on its certificate so as to, in effect, permit it to engage in a general common carrier service over its existing route as to all points thereon, including interline privileges with other transportation agencies, and to extend its route from Arlington some four miles southwest to Dalworthington Gardens, which admittedly had no public transportation. We are not here concerned with proposed schedules.

This application was protested by Texas Motor Coaches, a competing common carrier operating between Dallas and Fort Worth over Highway 80 which substantially parallels appellant's route between the city limits of Dallas and Arlington, but runs north of and on the opposite side of the T. & P. Ry. Co. lines in this area. Extensive hearings were had before the examiner for the Railroad Commission, in which 128 witnesses testified, 88 for the applicant and 40 for the protestant, of the latter some 33 being drivers of its busses.

The Commission granted the extension applied for beyond Arlington to Dalworthington Gardens, but denied the application in all other respects.

A statement of facts aggregating 641 pages was compiled in those hearings. Upon the trial herein appealed from, none of these witnesses except the president of appellant corporation testified, but the record of the hearing before the examiner was introduced as a part of the record of the trial herein, and made a part of this record. In addition the Railroad Commission, in its findings and order here involved, adopted that record as a basis for its findings and action. Consequently there is presented a voluminous record wherein the controlling issue is whether or not the order of the Commission is supported by substantial evidence. Even a summary of

the evidence is impracticable and would unduly prolong this opinion.

It is not controverted that since 1941 the need and convenience for additional transportation facilities over both the northern route (that of Texas Motor Coaches, protestant) and over the southern route (that of appellant) has increased tremendously. The necessity for and convenience of such additional service is not disputed, but it is contended that the Texas Motor Coaches can and does adequately provide it for patrons on both sides of the T. & P. Ry. There is no contention that additional burdens would be placed upon the highways by granting appellant's application, nor that it cannot furnish the facilities. It already has the equipment, and is operating it over the highways. Being required to operate with closed doors enroute to and from the war plants, the evidence shows that when more passengers are going to such plants than are leaving them, and vice versa; and between work shifts at such plants, appellant's equipment not infrequently travels one way empty or partially so, without authority to pick up passengers along its route who desire transportation elsewhere than to or from the war plants. In the last analysis, therefore, there is presented largely a matter of competition between these two carriers and whether the protestant, Texas Motor Coaches, can adequately meet the need and convenience of the traveling public living south of the T. & P. Ry. Co. lines, to whom appellant's service is more accessible.

After a careful consideration of all the evidence we have reached the conclusion that the finding of the Railroad Commission that Texas Motor Coaches can meet that need and convenience is not supported by substantial evidence, but is so contrary to the overwhelming preponderance of the evidence as to be clearly wrong and unreasonable. The trial court filed findings of fact. In the original findings he found that intervenor's (Texas Motor Coaches) service was adequate for all this area except during peak hours, and took judicial notice that during peak hours all transportation facilities are overtaxed; that crossings over the T. & P. lines between the two routes were adequate, and did not constitute a serious barrier to residents south of the railroad in crossing it and using the facilities of the Texas Motor Coaches; and that east of Grand Prairie the railroad, which there ran north of both routes, presented no barrier at all.

However, at the request of appellant, the trial court filed additional findings, supported by the evidence, which, in our opinion, affirmatively show not only need for and convenience of the service, but that Texas Motor Coaches cannot adequately supply it. Those findings are:

"4. Since 1941 the population of Grand Prairie has increased from approximately 1500 to somewhere between 15,000 and 25,000.

"5. Substantially all of the territory from Dallas to a point west of Grand Prairie and south of Jefferson Highway has developed to the extent that it is all practically built up with thousands of new houses and homes in that territory, and in fact there has been a large development in this respect all the way from Dallas to Arlington.

"6. Dalworthington Gardens has no public transportation of any kind.

"7. The people of Dalworthington Gardens use both Oak Cliff and Dallas, as well as Arlington and Grand Prairie for trading purposes.

"8. The people of Arlington, Arcadia Park, Grand Prairie and all other communities and portions of territory from Arlington eastward along plaintiff's route do considerable shopping and banking at the business centers of Oak Cliff as well as downtown Dallas.

"9. There has also been substantial developments along U. S. Highway 80 and North thereof.

"10. Plaintiff operates under authority of the city over city streets of Dallas, operating all the way down Jefferson Avenue, which is a continuation of Jefferson Highway, passing immediately through all of the main business section of Oak Cliff enroute to downtown Dallas.

"11. Jefferson Highway and U. S. Highway 80 are separated by the Texas & Pacific Railroad which lies between the two highways to a point east of Grand Prairie from which point the two highways diverged to a maximum separation of approximately 3/4ths mile, but from said point eastward the two highways are separated by fields, creeks, gullies and ditches.

"12. Except within the city limits of Dallas in Oak Cliff there are very few

public thoroughfares between Jefferson Highway and U.S. Highway 80 and only two or three crossings over the T & P Railroad between the Dallas City limits and Grand Prairie. Within the City of Grand Prairie there are four public crossings over the T & P Railroad between the two highways and an equal number in the City of Arlington. Most of the streets in Grand Prairie and Arlington being streets which dead-end at the railroad.

"13. Intervenor Texas Motor Coaches operates on both sides of the T & P Railroad through approximately one-half of the City of Arlington, the same being on the west side of Arlington, but does not operate on each side of the railroad through the eastern half of Arlington.

"14. Much of the right-of-way of T & P Railroad is fenced, making crossings as trespassers impracticable, and in fact on one stretch in Grand Prairie for a distance of 1-½ miles impossible because of the high so-called cyclone fence.

"15. Much of the right-of-way of T & P Railroad lies on high or relatively high embankments. The right-of-way of the railroad between the two highways is for the most part grown up in weeds and brush for great distances along each side of the railroad, and between the two highways there are ditches, washes and at some places creeks.

"16. The only other bus service operated to the City of Cockrell Hill, other than plaintiff which operates through the center of the business district and Texas Motor Coaches which operates to the north and along the north side of the City of Cockrell Hill, is that operated by the Dallas Street Railway Company."

In addition to the foregoing it was shown that the T. & P. Ry. between Fort Worth and Dallas, which in addition to its general traffic served the various war plants between these cities, carried a heavy load of railway traffic and that crossing accidents thereon were not infrequent. As a safety measure an overpass over said railway was constructed at one of the war plants, but its use was confined to war plant employees and was not available to the public. Thus over an appreciable part of the route involved actual linear proximity of the two routes to each other is no evidence of convenience. Direct proximity of only a few hundred feet to a desired point of transportation is of no significance to a passenger, if, because of intervening obstacles he be required to travel a mile and a half to reach it, as the testimony of some witnesses clearly showed.

Nor do we think the testimony of the bus drivers of the competing carrier as to adequate transportation by them, and of the traffic records showing average number of empty seats on busses of Texas Motor Coaches during their operating period, constitute such substantial evidence as to negative need for and convenience of the added service over Jefferson highway. The Texas Motor Coaches operated 34 thirty-minute schedules between 5:10 a.m. and midnight, using therefor 21 vehicles. Each schedule consisted of at least two busses and at times during the day as many as five busses on a single schedule. While some schedules showed available empty seats, particularly during early and late hours, the evidence clearly showed crowded conditions during daytime hours, when, in addition to war plant employees, the general public normally used such transportation, with standing room only and frequently no room at all. But we do not consider the mere fact that Texas Motor Coaches could, as one driver stated, always "make room for one more" and by crowding actually transport all passengers applying to it for transportation, as in itself negativing the need and convenience for additional service over the southern route.

■ There is no contention that the granting of such application would create ruinous competition with Texas Motor Coaches nor in any manner reduce its ability to render adequate service and earn a fair return on its investment. However, no such motor carrier has any vested right in a continuing use of the public highway for profit; nor in the public patronage over such highway, other than to serve its necessity and convenience. And where such public necessity and convenience outweigh the private interests of such carrier, the latter become subordinate to the former. Texas Motor Coaches v. R. R. Comm., Tex. Civ.App., 59 S.W.2d 923.

■ While an applicant for such a certificate must show both convenience and necessity for such service (Railroad Comm. v. Shupee, Tex.Civ.App., 57 S.W.2d 295, 300), obviously the term necessity as used in the Motor Carrier Act does not mean absolute or indispensable. It is used rather with a relative connotation. Convenience of a proposed service merely to a few of

the traveling public who could, though inconveniently, avail themselves of existing transportation facilities in the general vicinity, obviously creates no public need. But where such a service becomes a convenience, by saving time and distance and elimination of danger hazards to a large number of the public, though not indispensable to them, it may thereby become a necessity within the meaning of the law. Thus the two terms cannot be considered separately and distinctly and entirely independent of each other. They are, of necessity, interrelated; and the convenience of the public may reach such proportions as to be appropriately deemed a necessity within the contemplation of the law.

 It was also shown that a statement made by Mark Raley, variously referred to as an agreement, at the hearing before the Commission in 1941 on which his original certificate was granted, had some bearing on the action of the Commission in refusing appellant's application in the instant case. In this regard the record shows: Raley applied for an open door service over the route in question in 1941. At that hearing some question was raised as to whether he had shown necessity and convenience for service other than to and from war plants. When this question was raised by one of the Commissioners, Raley stated in open hearing that he would be satisfied with such limitation on his certificate, if granted, and that was accordingly done. His certificate, however, did not show that such limitation was placed therein by agreement. Appellant, when it acquired such certificate, had no knowledge of any such so-called agreement. In the conference of the Commissioners upon which the order here attacked was entered, and as one of the reasons for refusing appellant the added service applied for, it is not controverted that Raley's so-called original "agreement" was discussed by the Commissioners and in his testimony upon the trial herein, one of the Commissioners, who was cognizant of the facts above stated, testified, "but I want to reiterate that Mark Raley's statement over there, when we had the oral argument, was not the whole reason why I have refused to grant you open doors." From this it may reasonably be inferred that this so-called "agreement" made by Raley in 1941, to some extent at least influenced one of the Commissioners in denying the application here involved; and resulted in less weight being given the testimony showing need and convenience for the added service. If so, the Commission was clearly wrong in doing so. Such a certificate is not a contract with the State. All operations under it are subject to limitation, extension, regulation, and control by the Commission, in the public interest. That duty is imposed by Art. 911a, Sec. 4, Vernon's Ann. Civ.St., on the Commission, and obviously any agreement which would limit the duties of the Commission or the rights of the holder as to future conditions, the needs and convenience of the public would be wholly invalid and entitled to no consideration. Appellant's application to render the additional service by removal of the restrictions imposed in the original certificate in 1941, was predicated upon changed conditions as they existed in 1943; and must be determined in accordance with such needs and convenience as existed at that time; not by the conditions prevailing in 1941; nor by any prior commitment based upon them. The so-called agreement of Raley in 1941 was entitled to no consideration nor weight whatever in passing upon appellant's application.

Appellant also contends that the result of the order here attacked is to give the intervenor, Texas Motor Coaches, a monopoly on such transportation and to discriminate as between passengers using the two carriers. We are not impressed with these contentions; but in view of the conclusions above discussed, we do not deem it necessary to consider them here.

 We conclude that the order appealed from is unjust and unreasonable and should be set aside as invalid. However, it is apparent, we think, that the court cannot undertake, by injunction, to enter such an order as the Railroad Commission should have entered. The judgment of the trial court is reversed, the order of the Commission appealed from is set aside, and appellant is relegated to the Railroad Commission for appropriate relief not inconsistent with this opinion.

Judgment reversed and Railroad Commission's order set aside.